UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
JIANHUI HU, ZHISHONG LIU, JINQUAN         :
YIN, XING XING AND YAN FENG CHENG,

                                          :

          Plaintiffs,

                                          :

          -against-                            **REPORT AND RECOMMENDATION**

                                          :

226 WILD GINGER INC. d/b/a WILD GINGER,        17-CV-10161 (JGK) (KNF)
51 WILD GINGER INC. d/b/a WILD GINGER     :
AND SHAN YOU CHEN,

                                          :

          Defendants.
----------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE JOHN G. KOELTL, UNITED STATES DISTRICT JUDGE

          Jianhui Hu ("Hu"), Zhishong Liu ("Liu"), Jinquan Yin ("Yin"), Xing Xing ("Xing") and

Yan Feng Cheng ("Cheng") commenced this action against 226 Wild Ginger Inc., 51 Wild

Ginger Inc. and Shan You Chen for unpaid wages and overtime compensation under the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and New York Labor Law ("NYLL").  A

default judgment was entered against the defendants and the matter was referred to the Court for

an inquest on damages.  The Court directed the plaintiffs to file proposed findings of fact and

conclusions of law, an inquest memorandum of law, accompanied by supporting affidavits and

exhibits, setting forth their damages.  See Docket Entry No. 66.  The plaintiffs filed: (1)

"Plaintiffs' Proposed Findings of Fact and Conclusions of Law," Docket Entry No. 69; (2) their

affidavits, Docket Entry Nos. 69-1 to 69-5; (3) two documents styled "NYS Department of State

Division of Corporations Entity Information," Docket Entry Nos. 69-6 and 69-7; and (4) a five-

page document styled "For Settlement Purposes Only and Without Prejudices Damages

Calculation," bearing the name of the law firm engaged by the plaintiffs and its address, "TROY

LAW, PLLC 41-25 Kissena Blvd, Suite 119 Flushing, NY 11355."  Thereafter, the Court ordered an inquest hearing and directed the plaintiffs to "be prepared to provide to the Court competent evidence in support of plaintiffs' claims, including evidence, if any, in support of counsel's application for attorney fees."  Docket Entry No. 70.  On January 14, 2020, the inquest hearing was conducted at which Xing, Cheng, Hu and Liu testified.  The defendants did not respond to the plaintiffs' inquest submissions or appear at the inquest hearing.

## INQUEST SUBMISSIONS

In the section "Plaintiffs' Hours of Work" of the "Plaintiffs' Proposed Findings of Fact and Conclusions of Law," the plaintiffs contend that the defendants "did not maintain and provide employment records of Plaintiffs' hours, wages, and terms and conditions of employment," and the plaintiffs "rely upon their credible testimony of their hours worked, their employment period, and their terms and conditions of employment."  In the section "Overtime & Spread of Time Pay" of the "Plaintiffs' Proposed Findings of Fact and Conclusions of Law,"  the plaintiffs assert that Hu, Liu, Yin and Cheng were paid at two different rates, "a flat rate of one thousand dollars ($1,000.00) per month" and "seven dollars and fifty cents ($7.50) per hour" and Xing was paid "$6.50 per hour," regardless of the hours each worked and these rates were "without tips included to [sic] the regular pay rate."  In the section "Overtime & Spread of Time Pay," the plaintiffs contend that Hu's, Liu's, Yin's, Xing's, Cheng's and "Plaintiff Reymundo['s]"

> Wage Shortfall is found by the difference between the amount which Plaintiff should have been paid (the product of the applicable minimum wage and the minimum of forty or the total number of hours worked, plus the product of one and one times the minimum wage and the hours worked in excess of forty should the Plaintiff work in excess of forty (40) for that workweek) and total amount which he is paid (taken directly from the paystub as the sum of the products of the hourly pay and the weekly hours pay allocated to that hourly wage rate).

The plaintiffs maintain that they are "entitled to overtime pay at a rate of one-half times their regular rates of pay and 'spread of hours' pay on those days for which their shifts were more than 10 hours." According to the plaintiffs: (A) from "September 30, 2013 to October 31, 2014," Hu "worked for *late shifts* from 11:00 to 15:30 and again from 17:00 to 23:00 for ten and a half (10.5) hours per day for five (5) days per week"; (B) from "April 01, 2012 to October 30, 2012" Liu "worked from 11:00 to 23:00, for twelve (12) hours per day for five (5) days per week" and from "November 1, 2012 to October 31, 2014," Liu "worked for *late shifts* from 11:00 to 15:30 and again from 17:00 to 23:00, for ten and a half (10.5) hours per day for five (5) days per week"; (C) from "March 7, 2013 to October 30, 2014," Yin "worked for *late shifts* from 11:00 to 15:30 and again from 17:00 to 23:00, for ten and a half (10.5) hours per day for five (5) days per week"; and (D) from "November 30, 2011 to October 30, 2012," Cheng "worked from 11:00 to 23:00, for twelve (12) hours per day for five (5) days per week," from "November 1, 2012 to March 7, 2013," he "worked from 11:00 to 15:30 and again from 17:00 to 23:00, for ten and a half (10.5) hours per day for five (5) days per week" and from "November 01, 2013 to October 30, 2014," he "worked for *late shifts* from 11:00 to 15:30 and again from 17:00 to 23:00, for ten and a half (10.5) hours per day for five (5) days per week." The plaintiffs seek liquidated damages because "Defendants willfully have not created or preserved Plaintiff Sandro; Plaintiff Carlos and Plaintiff Reymundo's employee records." The plaintiffs request damages for the defendants' notice violations under NYLL, and they assert that a "prevailing party is entitled to attorney's fees under the FLSA and NYLL."

Plaintiffs' Affidavits

Hu states in his affidavit that he was employed as a delivery person by the defendants from September 30, 2013, to April 28, 2017. Concerning his work hours, Hu states:

3

12.     From September 30, 2013 to October 31, 2014, my working schedule ran:
        a. *For early shifts:*
        i. From 11:00 to 15:30 and again from 17:00 to 21:30 for early shifts for nine (9) hours a day for five (5) days or forty-five (45) hours a week;
        ii. From 15:00 to 21:30 for one (1) half day on Sunday for six and a half (6.5) hours a day;
        *b. For late shifts:*
        i. From 11:00 to 15:30 and again from 17:00 to 23:00 for late shifts for ten and a half (10.5) hours a day for five (5) days or fifty-two and a half (52.5) hours a week;
        ii. From 15:00 to 21:30 for one (1) half day on Sunday for six and a half (6.5) hours a day.

13.     From September 30, 2013 to October 31, 2014, I worked around fifty-one and a half (51.5) hours a week for early shifts and fifty-nine (59) hours a week for late shifts for an average of fifty-five and a quarter (55.25) hours per week.

14.     From November 1, 2014 to December 31, 2014, my work schedule ran:
        a. From 12:00 to 15:30 and again from 18:00 to 23:00 for eight and a half (8.5) hours a day for four (4) days a week or thirty-four (34) hours a week.
        b. From 17:00 to 23:00 for one (1) half day on Sunday for six (6) hours a day.

15.     From November 1, 2014 to December 31, 2014, I worked around forty (40) hours per week.

16.     In 2015, my working schedule ran:
        a. *For early shifts:*
        i. From 11:30 to 15:30 and again from 17:30 to 23:00 for nine and a half (9.5) hours a day for two (2) days or nineteen (19) hours a week;
        ii. From 11:30 to 15:30 and again from 17:00 to 22:00 for nine (9) hours a day on Wednesday;
        iii. From 11:00 to 15:30 and again from 17:00 to 22:00 for nine and one half (9.5) hours a day on Friday; and
        iv. From 15:00 to 22:00 for one (1) half day on Sunday for seven (7) hours a day.
        *b. For late shifts:*
        i. From 12:00 to 15:30 and again from 18:00 to 23:00 for eight and a half (8.5) hours a day for three (3) days or twenty-five and one half (25.5) hours a week;
        ii. From 12:00 to 15:30 and again from 17:30 to 23:00 for nine (9) hours a day on Friday;
        iii. From 18:00 to 23:00 for one (1) half day on Thursday for nine (9) hours a day; and
        iv. From 17:00 to 23:00 for one (1) half day on Sunday for six (6) hours a day.

17.     In 2015, I worked around forty-four and a half (44.5) hours a week for early shifts and forty-five and a half (45.5) hours a week for late shifts for an average of forty-five (45) hours per week.

4

18.     From 2016 onwards, my working schedule ran:
        a. *For early shifts:*
        i. From 10:45 to 15:15 and again from 17:00 to 21:00 for nine (9) hours a
        day for two (2) days or eighteen (18) hours a week;
        ii. From 11:00 to 15:30 and again from 18:00 to 23:00 for nine and a half
        (9.5) hours a day on Thursday;
        iii. From 11:00 to 15:15 and again from 17:00 to 21:30 for eight and four-
        fifths (8.8) hours a day on Friday;
        iv. From 18:00 to 23:00 for one (1) half day on Sunday for seven (7) hours
        a day.
        b. *For late shifts:*
        i. From 11:30 to 15:30 and again from 18:00 to 23:00 for nine (9) hours a
        day for two (2) days or eighteen (18) hours a week;
        ii. From 11:00 to 15:00 and again from 17:30 to 21:30 for eight and a half
        (8.5) hours a day on Wednesday;
        iii. From 11:00 to 15:30 and again from 17:00 to 21:30 for nine (9) hours a
        day on Friday; and
        iv. From 18:00 to 23:00 for one (1) half day on Sunday for six (5) [sic] hours
        a day.

19.     From 2016 onwards, I worked around forty and a half (40.5) hours a week
        for early shifts and forty-one and a quarter (41.25) hours a week for late
        shifts for an average of 48.88 hours per week.

Hu was paid $1,000 per month, in cash, from September 30, 2013, to June 30, 2014.  From July

1 to April 28, 2017, Hu was paid $7.50 per hour.  Hu was required to maintain a delivery vehicle

and was not compensated "for the costs to purchase and maintain" the vehicle.  Hu was never

compensated for overtime and spread-of-hours and he never received any notices regarding

overtime and wages, his rate of pay and "employer's regular pay day."

Liu states in his affidavit that he was employed as a delivery person by the defendants

from April 1, 2012, to April 28, 2017.  Concerning his work hours, Liu states:

7.     From April 1, 2012 to October 30, 2012, my working schedule ran:
       a. From 11:00 to 23:00 for twelve (12) hours a day for five (5) days a week
       or sixty (60) hours a week;
       b. From 15:00 to 23:00 for one (1) half day on Saturday for eight (8) hours
       a day.

8.     From April 1, 2012 to October 30, 2012, I worked around sixty-eight (68)
       hours a week.

9.     From November 1, 2012 to March 7, 2013 my work schedule ran:

       a. From 11:00 to 15:30 and again from 17:00 to 23:00 for ten and a half (10.5) hours a day five (5) days a week or fifty-two and a half (52.5) hours a week; and

       b. From 15:00 to 21:30 for one (1) half day on Sunday for six and a half (6.5) hours a day.

10.    From November 1, 2012 to March 7, 2013, I worked around fifty-nine (59) hours per week.

11.    From March 8, 2013 to October 31, 2014, my working schedule ran:

       a. *For early shifts:*

       i. From 11:00 to 15:30 and again from 17:00 to 21:30 for nine (9) hours a day for five (5) days or forty-five (45) hours a week;

       ii. From 15:00 to 21:30 for one (1) half day on Sunday for six and a half (6.5) hours a day;

       b. *For late shifts:*

       i. From 11:00 to 15:30 and again from 17:00 to 23:00 for ten and a half (10.5) hours a day for five (5) days or fifty-two and a half (52.5) hours a week;

       ii. From 15:00 to 21:30 for one (1) half day on Sunday for six and a half (6.5) hours a day.

12.    From March 8, 2013 to October 31, 2014, I worked around fifty-one and a half (51.5) hours a week for early shifts and fifty-nine (59) hours a week for late shifts for an average of fifty-five and a quarter (55.25) hours per week.

13.    From November 1, 2014 to December 31, 2014, my working schedule ran:

       a. From 11:00 to 15:00 and again from 17:00 to 21:30 for eight and a half (8.5) hours a day on Monday;

       b. From 12:00 to 15:30 and again from 18:00 to 23:00 for eight and a half (8.5) hours a day on Tuesday;

       c. From 11:30 to 15:30 and again from 17:30 to 22:00 for eight and a half (8.5) hours a day on Wednesday;

       d. From 12:00 to 15:30 and again from 18:00 to 23:00 for eight and a half (8.5) hours a day on Thursday; and

       e. From 15:00 to 21:30 for one (1) half day on Sunday for six and a half (6.5) hours a day.

14.    From November 1, 2014 to December 31, 2014, I worked around forty and a half (40.5) hours.

15.    From 2015 onwards my schedule ran:

       a. From 12:00 to 15:30 and again from 17:30 to 22:00 for eight and a half (8.5) hours a day for three (3) days a week or twenty-five and a half (25.5) hours a week;

       b. From 11:00 and again from 15:30 and again from 17:00 to 21:30 for nine (9) hours a day on Friday;

       c. From 18:00 to 23:00 on Wednesday for five (5) hours; and

       d. From 15:00 to 21:30 on Sunday for six and a half (6.5) hours a day.

16.    From 2015 onwards I worked around forty-six (46) hours a week.

Liu was paid $1,000 per month, in cash, from April 1, 2012, to June 30, 2014.  From July 1, 2014, to April 28, 2017, Liu was paid $7.50 per hour.  Beginning on April 1, 2016, the defendants "would claim a meal credit of one hundred dollars ($100.00) per month against the minimum wage."  Liu was required to maintain a delivery vehicle and was not compensated "for the costs to purchase and maintain" the vehicle.  Liu was never compensated for overtime and spread-of-hours and he never received any notices regarding overtime and wages, his rate of pay and "employer's regular pay day."

Yin states in his affidavit that he was employed by the defendants as a delivery person from March 7, 2013, to April 28, 2017.  Concerning his work hours, Yin states:

> 7.      From March 7, 2013 to October 30, 2014, my working schedule ran:
> a. *For early shifts:*
> i. From 11:00 to 15:30 and again from 17:00 to 21:30 for nine (9) hours a day for five (5) days or forty-five (45) hours a week;
> ii. From 15:00 to 21:30 for one (1) half day on Sunday for six and a half (6.5) hours a day;
> *b. For late shifts:*
> i. From 11:00 to 15:30 and again from 17:00 to 23:00 for ten and a half (10.5) hours a day for five (5) days or fifty-two and a half (52.5) hours a week;
> ii. From 15:00 to 21:30 for one (1) half day on Sunday for six and a half (6.5) hours a day.
> 8.      From March 7, 2013 to October 30, 2014, I worked around fifty-one and a half (51.5) hours a week for the early shift and around fifty-nine (59) hours a week for the late shift and averaging around fifty-five and a quarter (55.25) hours a week.
> 9.      From November 1, 2014 to December 31, 2014 my work schedule ran:
> a. From 11:30 to 15:30 and again from 17:30 to 22:00 for eight and a half (8.5) hours a day for three (3) days a week or twenty-five and a half (25.5) hours a week;
> b. From 11:30 to 15:30 and again from 17:30 to 21:30 for eight and a half (8.5) hours a day on Friday; and
> c. From 17:00 to 23:00 for one (1) half day on Sunday for six (6) hours a day.
> 10.     From November 1, 2012 to December 31, 2014, I worked around forty (40) hours per week.
> 11.     From 2015 onwards, my working schedule ran:

> a. From 11:30 to 15:30 and again from 17:30 to 21:30 for eight and a half (8.5) hours a day on Monday;
> b. From 12:00 to 15:30 and again from 17:30 to 22:00 for eight (8) hours a day on Wednesday;
> c. From 12:00 to 15:30 and again from 18:00 to 23:00 for eight and a half (8.5) hours a day for two (2) days a week or seventeen (17) hours a week;
> d. From 18:00 to 23:00 for one (1) half day on Tuesday for five (5) hours a day; and
> e. From 15:00 to 21:30 for one (1) half day on Sunday for six and a half (6.5) hours a day.
>
> 12.    From 2015 onwards, I worked around forty-five (45) hours a week.

Yin was paid $1,000 per month, in cash, from March 7, 2013, to June 30, 2014. From July 1, 2014, to April 28, 2017, Yin was paid $7.50 per hour. Yin was required to maintain a delivery vehicle and was not compensated "for the costs to purchase and maintain" the vehicle. Yin was never compensated for overtime and spread-of-hours and he never received any notices regarding overtime and wages, his rate of pay and "employer's regular pay day."

Xing states in his affidavit that he was employed by the defendants as a delivery person from February 1 to September 1, 2015. Concerning his work hours, Xing states:

> 9.     During my employment with the Defendants, my regular work schedule ran from 11:30 to 15:00, for four (4) hours per day, five (5) days per week. However, I often would need to stay until 15:30 regularly to finish my deliveries.
> 10.    Therefore, I worked approximately twenty (20) hours per week from on or about February 1, 2015 to September 1, 2015.

Xing worked "4" hours a day five days a week and was paid $26 per day. Xing never received "any notice that Defendants would be taking a tip credit against the minimum wage." Xing was required to maintain a delivery vehicle and was not compensated "for the costs to purchase and maintain" the vehicle. Xing never received any notices regarding overtime and wages, his rate of pay and "employer's regular pay day."

Cheng states in his affidavit that he was employed by the defendants as a delivery person from November 30, 2011, to April 28, 2017. Concerning his work hours, Cheng states:

12.    From November 30, 2011 to October 30, 2012, my working schedule ran:
a. From 11:00 to 23:00 for twelve (12) hours a day for five (5) days a week
or sixty (60) hours a week; and
b. From 15:00 to 23:00 for one (1) half day on Saturday for eight (8) hours
a day.

13.    From November 30, 2011 to October 30, 2012, I worked around sixty-eight
(68) hours a week.

14.    From November 1, 2012 to March 7, 2013 my work schedule ran:
a. From 11:00 to 15:30 and again from 17:00 to 23:00 for ten and a half
(10.5) hours a day for five (5) days a week or fifty-two and a half (52.5)
hours a week; and
b. From 15:00 to 21:30 for one (1) half day on Saturday or Sunday for six
and a half (6.5) hours a day.

15.    From November 1, 2012 to March 7, 2013, I worked around fifty-nine (59)
hours per week.

16.    From November 1, 2013 to October 30, 2014, my working schedule ran:
a. *For early shifts:*
i. From 11:00 to 15:30 and again from 17:00 to 21:30 for nine (9) hours a
day for five (5) days or forty-five (45) hours a week; and
ii. From 15:00 to 21:30 for one (1) half day on Sunday for six and a half
(6.5) hours a day.
*b. For late shifts:*
i. From 11:00 to 15:30 and again from 17:00 to 23:00 for ten and a half
(10.5) hours a day for five (5) days or fifty-two and a half (52.5) hours a
week; and
ii. From 15:00 to 21:30 for one (1) half day on Sunday for six and a half
(6.5) hours a day.

17.    From November 1, 2013 to October 31, 2014, I worked around fifty-one
and a half (51.5) hours a week for early shifts and fifty-nine (59) hours a
week for late shifts for an average of fifty-five and a quarter (55.25) hours
per week.

18.    From November 1, 2014 to December 31, 2014, my working schedule ran:
a. From 11:00 to 15:00 and again from 17:00 to 21:30 for eight and a half
(8.5) hours a day for three (3) days or twenty-five and a half (25.5) hours a
week;
b. From 11:00 to 15:00 for four (4) hours a day on Friday;
c. From 15:00 to 21:30 for six and a half (6.5) hours a day on Saturday;
d. From 18:00 to 23:00 for five (5) hours a day on Sunday.

19.    From November 1, 2014 to December 31, 2014, I worked around forty-one
(41) hours.

20.    In 2015, my schedule ran:
a. From 11:00 to 15:30 and again from 17:30 to 21:30 for nine (9) hours a
day for three (3) days a week or twenty-seven (27) hours a week;
b. From 18:00 to 23:00 for five (5) hours a day on Monday;
c. From 15:00 to 22:00 on Saturday for seven (7) hours; and
d. From 17:00 to 23:00 on Sunday for six (6) hours a day.

21.     From 2015 I worked around forty-five (45) hours a week.
22.     From 2016 onwards, my schedule ran:
        a. From 11:30 to 15:30 and again from 18:30 to 23:00 for nine (9) hours a
        day for two (2) days a week or eighteen (18) hours a week;
        b. From 11:00 to 15:30 and again from 17:00 to 21:30 for nine (9) hours a
        day for two (2) days a week or eighteen (18) hours a week;
        c. From 17:00 to 23:00 on Saturday for six (6) hours a day.
23.     From 2016 I worked around forty-two (42) hours a week.

Cheng was paid $1,000 per month, in cash, from September 30, 2013, to June 30, 2014.  From

July 1, 2014, to April 28, 2017, Cheng was paid $7.50 per hour.  Cheng was never compensated

for overtime and spread-of-hours and he never received any notices regarding overtime and

wages, his rate of pay and "employer's regular pay day."  Cheng was required to maintain a

delivery vehicle and was not compensated "for the costs to purchase and maintain" the vehicle.

Inquest Hearing

        Hu testified that he worked as a delivery person for the defendants from 2013, when he

started working, to the end of April 2017, when the store closed.  "[A]t the very beginning," Hu

worked "from 11 in the morning to 9:30 in the evening."  "Later on," Hu "started working four

and one half day."   When Hu received "1,000, [he] worked five days, five full days and one half

day," "then in 2014, when it's $7.50, it was 40-something hours per week."  Hu used an electric

bike for deliveries that he purchased on the first day of work.

        Liu testified that he worked as a delivery person for the defendant, from April 1, 2012, to

April 28, 2017.  Liu worked "from 11:00 to 11:00 in the evening.  "In the very beginning, it was

six days per week" and "[l]ater on it became four full days and two half days."  Liu was paid

$1,000.  Liu testified that, "starting around July 2014, they changed my pay to $7.50 per hour."

Liu purchased an electric bike when he started working "[p]rimarily so that I can do delivery."

Xing testified that he worked as a delivery person for the defendants, from February 1 to September 1, 2015, and his work schedule was "from 11:30 to 3:30," five days per week.  Xing was paid $26 per day.  Xing used an electric bike for deliveries, which he purchased before he started working for the defendants.

Cheng testified that he worked as a delivery person for the defendants, from November 30, 2011, to April 28, 2017.  Cheng worked "[f]rom the morning 11:00 to the evening at 11:00," five days a week, namely, "Monday, Tuesday, Wednesday, Thursday, and Friday and Sunday." "From the very beginning," Cheng was paid "$1,000 per month, and then later they changed it to $7.50 per hour," in July 2014.  Cheng purchased an electric bike that he used for deliveries when he started working for the defendants, and "the cost associated with this electric bike" was "$1,400."

## LEGAL STANDARD

"Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true.  The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999) (citation omitted).  Establishing the appropriate amount of damages involves two steps: (1) "determining the proper rule for calculating damages on . . . a claim"; and (2) "assessing plaintiff's evidence supporting the damages to be determined under this rule." Id.  When assessing damages, a court cannot "just accept [the plaintiff's] statement of the damages"; rather, damages must be established "with reasonable certainty." Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc., 109 F.3d 105, 111 (2d Cir. 1997).

**FLSA**

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages . . . not less than . . . $7.25 an hour.

29 U.S.C. § 206(a)(1)(C).

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

"The regular rate of pay at which the employee is employed may in no event be less than the statutory minimum." 29 C.F.R. § 778.107. "The 'regular rate' under the Act is a rate per hour," unless an employee's earnings are determined on another basis. 29 C.F.R. § 778.109. "The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." 29 C.F.R. § 778.109. "Any employer who violates the provisions of section 206 or section 207 of [the FLSA] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). However,

> if the employer shows to the satisfaction of the court that the act or omission giving rise to [an action under FLSA] was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260.

> [I]f it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.

29 C.F.R. § 531.35.

"[I]n addition to any judgment awarded to the plaintiff or plaintiffs," the court shall "allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b).

## NYLL

The basic minimum hourly wage rate was $7.25 per hour on and after January 1, 2011, $8.00 per hour on and after December 31, 2013, $8.75 per hour on and after December 31, 2014, until and including December 30, 2015, $9 per hour on and after December 31, 2015, until and including December 30, 2016, $11 per hour on and after December 31, 2016 (for employers of eleven or more employees) and $10.50 per hour on and after December 31, 2016 (for employers of ten or fewer employees). See 12 NYCRR § 146-1.2. "An employer shall pay an employee for overtime at a wage rate of 1 1/2 times the employee's regular rate for hours worked in excess of 40 hours in one workweek." 12 NYCRR § 146-1.4. "The spread of hours is the length of the interval between the beginning and end of an employee's workday." 12 NYCRR § 146-1.6. "On each day on which the spread of hours exceeds 10, an employee shall receive one additional hour of pay at the basic minimum hourly rate." 12 NYCRR § 146-1.6(a). "The term regular rate shall mean the amount that the employee is regularly paid for each hour of work, before subtracting a tip credit, if any. 12 NYCRR § 146-3.5(a).

> If an employer fails to pay an employee an hourly rate of pay, the employee's regular hourly rate of pay shall be calculated by dividing the employee's total weekly earnings, not including exclusions from the regular rate, by the lesser of 40

hours or the actual number of hours worked by that employee during the work week.

12 NYCRR § 146-3.5(b).

"If an employee must spend money to carry out duties assigned by his or her employer, those expenses must not bring the employee's wage below the required minimum wage."  12 NYCRR § 146-2.7(c).

NYLL requires every employer to provide written notice of the rate of pay and the basis thereof, whether paid by the hour or otherwise, any allowances and certain other work-related information, as well as statements, "with every payment of wages, listing" certain work-related information, including the dates of work covered by that payment of wages and the rate of pay and basis thereof.  NYLL §§ 195(1) and (3).  A plaintiff may recover, for the employer's failure to provide required notices, damages not exceeding $5,000, "together with costs and reasonable attorney's fees," under each of NYLL §§ 195 (1) and (3).  See NYLL §§ 198 (1-b) and (1-d).

NYLL Article 19 provides:

> If any employee is paid by his or her employer less than the wage to which he or she is entitled under the provisions of this article, he or she shall recover in a civil action the amount of any such underpayments, together with costs all reasonable attorney's fees, prejudgment interest as required under the civil practice law and rules, and unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to one hundred percent of the total of such underpayments found to be due. Any agreement between the employee, and the employer to work for less than such wage shall be no defense to such action.

NYLL § 663(1).

"No employer shall make any deduction from the wages of an employee, except deductions which," inter alia, "are expressly authorized in writing by the employee and are for the benefit of the employee, provided that" certain conditions are met.  NYLL § 193(1)(b).

14

## APPLICATION OF LEGAL STANDARD

In the section "Overtime & Spread of Time Pay" of the "Plaintiffs' Proposed Findings of Fact and Conclusions of Law," the plaintiffs assert that

> Wage Shortfall is found by the difference between the amount which Plaintiff should have been paid (the product of the applicable minimum wage and the minimum of forty or the total number of hours worked, plus the product of one and one times the minimum wage and the hours worked in excess of forty should the Plaintiff work in excess of forty (40) for that workweek) and total amount which he is paid (taken directly from the paystub as the sum of the products of the hourly pay and the weekly hourly pay allocated to that hourly wage rate).

Other than reciting the same paragraph for each plaintiff, including non-existing "Plaintiff Reymundo," see Docket Entry No. 69, ¶¶ 32, 34, 36, 38, 40 and 41, no plaintiff identified the applicable minimum wage for any of the time periods during which any plaintiff worked.  Xing did not work any overtime hours, so it is not clear why he was included in the section, erroneously styled "Overtime & Spread of Time Pay."  No "Spread of Time Pay" exists in the NYLL, which provides for "[s]pread of hours greater than 10 in restaurants and all-year-hotels," see 12 NYCRR § 146-1.6, not "Spread of Time."  No evidence exists in the record about the size of the defendants' work force, namely, whether the defendants employed eleven or more or ten or fewer employees, which would determine the NYLL applicable hourly rates, on and after December 31, 2016.

The plaintiffs submitted a five-page document styled "For Settlement Purposes Only and Without Prejudices Damages Calculation," bearing their counsel's law firm name and address, "TROY LAW, PLLC 41-25 Kissena Blvd, Suite 119 Flushing, NY 11355."  However, no affidavit was submitted, or testimony offered at the inquest hearing, by any witness, including the plaintiffs' attorney, in connection with the five-page document providing any explanation respecting who created the five-page document and the meaning of any information therein

contained.  The five-page document is not referenced or explained in the "Plaintiffs' Proposed Findings of Fact and Conclusions of Law," except in the sections "Liquidated Damages" and "Damages for Notice Violations," where the plaintiffs make the following citation, in multiple paragraphs: "See *Exhibit 1-8* Damage Calculations."  However, no "*Exhibit 1-8* Damage Calculations" was submitted in support of the plaintiffs' inquest submissions; rather, the five-page document was filed without any accompanying affidavit, as Docket Entry No. 69-8, and is styled "For Settlement Purposes Only and Without Prejudices Damages Calculation."  In the "Plaintiffs' Proposed Findings of Fact and Conclusions of Law," the plaintiffs assert: (a) the way in which the "Wage Shortfall" is "found" for "Plaintiff Reymundo"; and (b) that "[r]meaning Defendants willfully have not created or preserved Plaintiff Sandro; Plaintiff Carlos and Plaintiff Reymundo's employee records"; however, no persons named Reymundo, Sandro and Carlos are plaintiffs in this action.

### Plaintiff Hu's Damages

Hu asserts in his affidavit that, from September 30, 2013, to October 31, 2014, he worked a different number of hours during the "early shifts" and "late shifts," without identifying the number of "early shifts" and "late shifts" that he worked during that time period.  In his affidavit, Hu states that, from September 30, 2013, to October 31, 2014, he worked "[f]rom 11:00 to 15:30 and again from 17:00 to 21:30 for early shifts for nine (9) hours a day for five (5) days or forty-five (45) hours a week" and "[f]rom 15:00 t0 21:30 for one (1) half day on Sunday for six and a half (6.5) hours a day."  However, at the hearing, Hu testified that "at the very beginning when [he] started working," he worked "from 11:00 in the morning to 9:30 in the evening," without identifying the starting and ending dates or the number of days per week when he worked that schedule.  Assuming that the meaning of "at the very beginning when [he] started working" is

from September 30, 2013, to October 31, 2014, Hu's testimony that he worked "from 11:00 in

the morning to 9:30 in the evening," which is ten and one half (10.5) hours per day, is

inconsistent with his affidavit in which he states that, from September 30, 2013, to October 31,

2014, he worked: (a) "[f]rom 11:00 to 15:30 and again from 17:00 to 21:30 for early shifts for

nine (9) hours a day for five (5) days"; and (b) "[f]rom 15:00 to 21:30 for one (1) half day on

Sunday for six and a half (6.5) hours a day."

 Hu claims that, in 2015, "[f]or late shifts," he worked, <u>inter alia</u>, "[f]rom 18:00 to 23:00

for one (1) half day on Thursday for nine (9) hours a day."  However, the number of hours

"[f]rom 18:00 to 23:00" is five (5), not "nine (9)," as Hu claims.  Hu asserts that, "from 2016

onwards," "[f]or early shifts," he worked "[f]rom 10:45 to 15:15 and again from 17:00 to 21:00

for nine (9) hours a day for two (2) days or eighteen (18) hours a week."  However, the number

of hours "[f]rom 10:45 to 15:15 and again from 17:00 to 21:00" is eight and one-half (8.5), not

"nine (9) hours," as Hu claims.  Hu claims that, "[f]rom 2016 onwards," "[f]or early shifts," he

worked "[f]rom 11:00 to 15:15 and again from 17:00 to 21:30 for eight and four-fifths (8.8)

hours a day on Friday."  However, the number of hours "[f]rom 11:00 to 15:15 and again from

17:00 to 21:30," is eight hours and three-quarters of an hour (8.75), not "eight and four-fifths

(8.8) hours," as claimed by Hu.  Hu claims that, "[f]rom 2016 onwards," "[f]or early shifts," he

worked "[f]rom 18:00 to 23:00 for one (1) half day on Sunday for seven (7) hours a day."

However, the number of hours "[f]rom 18:00 to 23:00" is five (5), not "seven (7)," as Hu claims.

Hu claims that, "[f]rom 2016 onwards," "[f]or late shifts," he worked "[f]rom 11:00 to 15:00 and

again from 17:30 to 21:30 for eight and a half (8.5) hours a day on Wednesday."  However, the

number of hours "[f]rom 11:00 to 15:00 and again from 17:30 to 21:30" is eight (8), not "eight

and a half (8.5)," as Hu claims.  Hu claims that, "[f]rom 2016 onwards," "[f]or late shifts," he

worked "[f]rom 18:00 to 23:00 for one (1) half day on Sunday for six (5) hours a day."

However, the number of hours "[f]rom 18:00 to 23:00" is five, not "six," as Hu claims.

Hu states in his affidavit: (1) "[f]rom on or about September 30 to June 30, 2014, [he] was paid at a flat rate of one thousand dollars ($1,000) per month, in cash.  This amount remained the same regardless of the number of actual hours I worked"; and (2) "[f]rom on or about July 1, 2014 to April 28, 2017, I was paid at a rate of seven dollars and fifty cents ($7.50) per hour."  Hu testified that: (i) "[w]hen I got $1,000, I worked five days, five full days and one half day"; and (ii) "then in 2014, when it's $7.50, it was 40-something hours per week."  Hu's statement in his affidavit that he was paid $1,000 per month, from September 30, 2013, to June 30, 2014, "regardless of the number of actual hours worked," is inconsistent with his testimony that "[w]hen I got $1,000, I worked five days, five full days and one half day" because in his affidavit, Hu states that he worked "five full days and one half day" from September 30, 2013, to October 31, 2014, whereas he worked "around forty (40) hours per week," or four days and one-half day, from November 2014 to December 31, 2014.  According to Hu's testimony, he received $1,000, from September 30, 2013, to October 31, 2014, which is inconsistent with his affidavit stating that he received $1,000, from September 30, 2013, to June 30, 2014.

In light of: (i) the inconsistencies concerning the hours worked and the compensation received; and (ii) the lack of any evidence identifying the amount of and the basis for calculating the damages Hu seeks, the Court finds that Hu failed to establish any amount of damages with reasonable certainty.  See Transatlantic Marine Claims Agency, Inc., 109 F.3d at 111.

Plaintiff Liu

Liu asserts in his affidavit that, from April 1 to October 30, 2012, he worked "sixty eight (68) hours a week," namely, "[f]rom 11:00 to 23:00 for twelve (12) hours a day for five days a

week," and "[f]rom 15:00 to 23:30 for one (1) half day on Saturday for eight (8) hours a day."
Liu testified that: (a) he was employed by the defendants from April 1, 2012, to April 28, 2017;
(b) his work schedule was "[i]n the morning from 11:00 to 11:00 in the evening"; and (c) "[i]n
the very beginning" he worked "six days per week.  Later on it became four full days and two
half days."  Liu's testimony that he worked twelve hours per day, "[i]n the morning from 11:00
to 11:00 in the evening," during his entire employment with the defendants, is inconsistent with
his affidavit, in which he states that he worked twelve hours per day only during the period from
April 1 to October 30, 2012, and only for five days per week.  Liu's affidavit does not indicate
that he worked "[i]n the morning from 11:00 to 11:00 in the evening," "six days per week" or
"four full days" per week, as he testified.

       Liu testified that, "[i]n the very beginning," he worked "six days per week," but "[l]ater
on it became four full days and two half days."  However, in his affidavit, Liu does not state that
he ever worked "four full days and two half days."  According to Liu's affidavit, the only time
period when Liu worked less than eight hours per day two days per week, namely, "on
Wednesday for five (5) hours" and "on Sunday for six and a half (6.5) hours," was "[f]rom 2015
onwards," when he also worked "for eight and a half (8.5) hours a day for three (3) days a
week."  However, Liu's statement that, "[f]rom 2015 onwards," he worked "for eight and a half
(8.5) hours a day for three (3) days a week" is inconsistent with the hours he claims he worked
during those "three (3) days a week," namely, "[f]rom 12:00 to 15:30 and again from 17:30 to
22:00," which makes the total number of hours eight (8), not "eight and a half (8.5)," as Liu
claims.

       In the "Plaintiffs Proposed Findings of Fact and Conclusions of Law," the following is
asserted in paragraph No. 46: "From November 1, 2012 to October 31, 2014," Liu worked "from

11:00 to 15:30 and again from 17:00 to 23:00, for ten and a half (10.5) hours per day for five (5) days per week," with a citation to Liu's affidavit paragraph Nos. 9 and 11. However, paragraph No. 9 of Liu's affidavit states that, "[f]rom November 1, 2012 to March 7, 2013," he worked "[f]rom 11:00 to 15:30 and again from 17:00 to 23:00 for ten and a half (10.5) hours a day for five (5) days a week," while paragraph No. 11 states, inconsistently with the assertion in paragraph No. 46 of the "Plaintiffs Proposed Findings of Fact and Conclusions of Law," that "[f]rom March 8, 2013 to October 31, 2014," he worked "[f]rom 11:00 to 15:30 and again from 17:00 to 21:30 for nine (9) hours a day for five (5) days" per week.

In light of the: (i) inconsistencies concerning the hours worked; and (ii) lack of any evidence identifying the amount of and the basis for calculating the damages Liu seeks, the Court finds that Liu failed to establish any amount of damages with reasonable certainty. See Transatlantic Marine Claims Agency, Inc., 109 F.3d at 111.

Plaintiff Yin

Yin did not testify at the hearing. In the section "Overtime & Spread of Time Pay" of the "Plaintiffs Proposed Findings of Fact and Conclusions of Law," the following is asserted at paragraph No. 48: "From March 7, 2013 to October 30, 2014," Yin worked "late shifts from 11:00 to 15:30 and again from 17:00 to 23:00 for ten and a half (10.5) hours per day for five days per week." No other hours of work are mentioned concerning Yin in the section "Overtime & Spread of Time Pay." However, in his affidavit, Yin states that he worked more hours and more time periods than it is claimed in paragraph No. 48 of the section "Overtime & Spread of Time Pay."

In his affidavit Yin asserts that, from March 7, 2013, to October 30, 2014, he worked: (1) "[f]or early shifts," "[f]rom 11:00 to 15:30 and again from 17:00 to 21:30 for nine (9) hours a

day for five days" and "[f]rom 15:00 to 21.30 for one (1) half day on Sunday for six and a half (6.5) hours a day"; and (2) "[f]or late shifts," "[f]rom 11:00 to 15:30 and again from 17:00 to 23:00 for ten and a half (10.5) hours a day for five (5) days" per week and "[f]rom 15:00 to 21:30 for one (1) half day on Sunday for six and a half (6.5) hours a day."  Yin also asserts in his affidavit that, from November 1 to December 31, 2014, he worked: (i) "[f]rom 11:30 to 15:30 and again from 17:30 to 22:00 for eight and a half (8.5) hours a day for three (3) days a week"; (ii) "[f]rom 11:30 to 15:30 and again from 17:30 to 21:30 for eight and a half (8.5) hours a day on Friday"; and (iii) "[f]rom 17:00 to 23:00 for one (1) half day on Sunday for six (6) hours a day."  However, the total number of hours Yin worked "on Friday," from November 1 to December 31, 2014, is eight (8), not "eight and a half (8.5)," as Yin claims.

Yin contends in his affidavit that, "[f]rom 2015 onwards," he worked: (1) "[f]rom 11:30 to 15:30 and again from 17:30 to 21:30 for eight and a half (8.5) hours a day on Monday"; (2) "for eight (8) hours a day on Wednesday"; (3) "for eight and a half (8.5) hours a day for two (2) days a week"; (4) "one (1) half day on Tuesday for five (5) hours a day"; and (5) "one (1) half day on Sunday for six and a half (6.5) hours a day."  However, the total amount of hours "[f]rom 11:30 to 15:30 and again from 17:30 to 21:30" is not "eight and a half (8.5)," as Yin claims, but eight (8).

In light of the: (i) inconsistencies concerning the hours worked; and (ii) lack of any evidence identifying the amount of and the basis for calculating the damages Yin seeks, the Court finds that Yin failed to establish any amount of damages with reasonable certainty.  See Transatlantic Marine Claims Agency, Inc., 109 F.3d at 111.

Plaintiff Xing

Xing states in his affidavit that, from February 1 to September 1, 2015: (a) his "regular work schedule ran from 11:30 to 15:00, for four (4) hours per day, five (5) days per week"; (b) he "often would need to stay until 15:30 regularly"; (c) he "worked approximately twenty (20) hours per week"; (d) he was paid "at a flat rate of twenty-six ($26.00) per day"; and (e) he "was not compensated for the costs to purchase and maintain my vehicle."  Xing testified at the hearing that he worked for the defendants, from February 1 to September 1, 2015, "from 11:30 to 3:30," five days per week, received compensation of $26 per day and purchased the electric bicycle he used for deliveries prior to his employment with the defendants.

Contrary to Xing's statement in his affidavit, the total amount of hours he worked during his "regular schedule," "from 11:30 to 15:00," is not "four (4)," but three and one half (3.5). Xing states in his affidavit that he "often would need to stay until 15:30," without identifying the frequency or approximate number of days on which he "would need to stay until 15:30."  Xing also states in his affidavit that he "often would need to stay until 15:30 regularly," which is an inconsistent statement because "often" and "regularly" are not synonyms; thus, they do not have the same meaning.  Xing's statement that he worked from 11:30 "until 15:30 regularly" is inconsistent with his statement that his "regular work schedule ran from 11:30 to 15:00."  Xing failed to identify, in his affidavit and during his testimony, "the costs to purchase and maintain" his electric bicycle.  Moreover, Xing testified that he purchased his electric bicycle prior to his employment with the defendants; thus, no basis exists to seek compensation from the defendants for the cost of purchasing his electric bicycle.

In light of the: (i) inconsistencies concerning the hours worked; and (ii) lack of any evidence identifying the amount of and the basis for calculating the damages Xing seeks, the

Court finds that Xing failed to establish any amount of damages with reasonable certainty.  See

Transatlantic Marine Claims Agency, Inc., 109 F.3d at 111.

  Plaintiff Cheng

  In the "Plaintiffs Proposed Findings of Fact and Conclusions of Law," the following is

asserted in paragraph Nos. 50-52:

> 50.  From November 30, 2011 to October 30, 2012, Plaintiff YAN FENG
> CHENG worked from 11:00 to 23:00, for twelve (12) hours per day for five
> (5) days per week. YAN FENG Aff. ¶ 12.
> 51.  From November 1, 2012 to March 7, 2013, Plaintiff YAN FENG CHENG
> worked from 11:00 to 15:30 and again from 17:00 to 23:00, for ten and a
> half (10.5) hours per day for five (5) days per week. YAN FENG Aff. ¶ 14.
> 52.  From November 01, 2013 to October 30, 2014, Plaintiff YAN FENG
> CHENG worked for *late shifts* from 11:00 to 15:30 and again from 17:00 to
> 23:00, for ten and a half (10.5) hours per day for five (5) days per week.
> YAN FENG Aff. ¶ 16.

Cheng testified that, from November 30, 2011, to April 28, 2017: (a) his work schedule was

"five days per week," "Monday, Tuesday, Wednesday, Thursday, and Friday and Sunday,"

"[f]rom the morning 11:00 to the evening at 11:00"; (b) "[f]rom the very beginning," he was paid

"$1,000 per month" and, in July 2014, "they changed it to $7.50 per hour"; and (c) he used an

electric bicycle for deliveries that he purchased for $1,400 when he started working for the

defendants.  Cheng's testimony that his work schedule was "five days per week" is contradicted

by his testimony that he worked on "Monday, Tuesday, Wednesday, Thursday, and Friday and

Sunday," which is six, not five days per week.  Contrary to Cheng's testimony that he worked for

the defendants from "November 30, 2011 to April 28, 2017," "[f]rom the morning 11:00 to the

evening at 11:00," Cheng states in his affidavit that he worked less than twelve hours per day

during various time periods, and he did not work for the defendants between March 8 and

October 31, 2013, namely, 33 weeks and 6 days.  A review of "Page 5 of 5" of the five-page

document styled "For Settlement Purposes Only and Without Prejudices Damages Calculation,"
bearing the plaintiffs' law firm name and address, "TROY LAW, PLLC 41-25 Kissena Blvd,
Suite 119 Flushing, NY 11355," Docket Entry No. 69-8, indicates that Cheng appears to seek
damages for the period "2013/03/08-2017/04/28," which encompasses the gap of time during
which Cheng does not claim in his affidavit that he worked for the defendants.

Cheng's affidavit contains inconsistencies concerning the hours he claims he worked for
the defendants.  For example, Cheng asserts that, in 2015, he worked "[f]rom 11:00 to 15:30 and
again from 17:30 to 21:30 for nine (9) hours a day for three (3) days a week."  However, the total
number of hours "[f]rom 11:00 to 15:30 and again from 17:30 to 21:30" is eight and one-half
(8.5), not "nine (9)," as Cheng claims.  Cheng asserts that, in 2016, he worked "[f]rom 11:30 to
15:30 and again from 18:30 to 23:00 for nine (9) hours a day for two (2) days a week."
However, the total number of hours "[f]rom 11:30 to 15:30 and again from 18:30 to 23:00" is
eight and one-half (8.5), not "nine (9)," as Cheng claims.

In light of the: (i) inconsistencies concerning the hours worked; and (ii) lack of any
evidence identifying the amount of and the basis for calculating the damages Cheng seeks, the
Court finds that Cheng failed to establish any amount of damages with reasonable certainty.  See
Transatlantic Marine Claims Agency, Inc., 109 F.3d at 111.

Other than asserting that "[a] prevailing party is entitled to attorney's fees under the
FLSA and NYLL" in the "Plaintiffs Proposed Findings of Fact and Conclusions of Law," the
plaintiffs did not make any argument or present any evidence concerning attorney's fees.  Thus,
no basis exists for awarding attorney's fees.

The Court notes that each of the plaintiffs' affidavits contains a paragraph stating: "This
document has been translated to me in my native language of Chinese, and I fully comprehend

24

the contents."  Apart from the fact that no "Chinese" language exists, none of the plaintiffs'

affidavits states who prepared them or who translated them.  Moreover, none of the affidavits is

accompanied by a translator's certification of accuracy, stating the source and target languages,

and verifying that the translation is true, accurate, complete and correct to the best of the

translator's ability.  Since it appears that the plaintiffs' affidavits were not prepared by the

plaintiffs and in the absence of any proof that each affidavit, seemingly prepared by an

unidentified person, was translated to each plaintiff by a translator certifying that the translation

from the source language to the target language is true, accurate, complete and correct, each

affidavit is suspect.  The Court cautions the plaintiffs' counsel that counsel's practice of

submitting such affidavits in the future will not be condoned.  As it is apparent from the many

inconsistencies in the plaintiffs' submissions, counsel's practice of submitting affidavits of this

type does nothing but a disservice to the plaintiffs because it inhibits the plaintiffs' opportunity

to prove their damages with reasonable certainty.  The Court's concern about counsel's practice

is especially grave where, as here, the plaintiffs do not appear to be native English language

speakers or have any command of the English language.

## RECOMMENDATION

For the foregoing reasons, I recommend that neither damages nor attorney's fees be

awarded to the plaintiffs.

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable J.

John G. Koeltl, 500 Pearl Street, Room 1330, New York, New York, 10007, and to the chambers

of the undersigned, 40 Centre Street, Room 425, New York, New York, 10007.  Any requests for

an extension of time for filing objections must be directed to Judge Koeltl.  ***Failure to file***

***objections within fourteen (14) days will result in a waiver of objections and will preclude***

***appellate review.***  See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash, 328

F.3d 98, 107 (2d Cir. 2003).

Dated:  New York, New York                           Respectfully submitted,
        March 17, 2020

                                                    KEVIN NATHANIEL FOX
                                                    UNITED STATES MAGISTRATE JUDGE